## TRUST CO. OF GEORGIA v. ROSE, Collector.

District Court, N. D. Georgia, Atlanta Division.
March 14, 1928.

No. 794.

1. **Internal revenue** ⚖️2(2)—**Taxable "income" under Constitution, must be new property acquired or increment detached from former investment; "derived" (Const. Amend. 16).**

Under constitutional provision permitting unapportioned taxation of incomes derived from any source (Const. Amend. 16), thing taxable is not mere increment of value, but either some new property acquired, or an increment so detached and severed from a former investment as to accrue to the separate benefit and enjoyment of taxpayer, since, to be "income," it must "come in," and to be "derived" it must be separated, taken "from the stream."

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Derive; Income.]

2. **Internal revenue** ⚖️7(11)—**Stock gained by trust company as result of organizing corporation and selling stock held not taxable as "compensation for personal services" (Revenue Act 1918, § 213 [Comp. St. § 6336⅛ff]).**

Where trust company, after buying stock of old corporation and organizing new corporation and selling its stock, had left several thousand shares of stock as profit on transaction, *held*, that such stock did not constitute "compensation for personal services" for income tax purposes, within Revenue Act 1918, § 213 (Comp.

St. § 6336⅛ff), since no one hired trust company to do anything, but it was prime mover in all that was done.

3. Internal revenue ⊕⇒7(10)—Increase in value of stock purchased by trust company in organizing corporation held not taxable as income until sale or exchange thereof (Revenue Act 1918, § 213 [Comp. St. § 6336⅛ff]).

Where trust company, as result of purchase of stock of corporation, organization of new corporation, and sale of stock to public, had left several thousand shares of stock, for which it paid $5 a share, and which a few days later had market value of $40 per share, but which under syndicate agreement was tied up in voting trust for five years, increased value of stock was not taxable as income under Revenue Act 1918, § 213 (Comp. St. § 6336⅛ff), until stock was sold or exchanged, and no taxable gain was realized on stock by its mere purchase.

At Law. Action by the Trust Company of Georgia against J. T. Rose, Collector. Judgment for plaintiff.

Anderson, Rountree & Crenshaw, of Atlanta, Ga., for plaintiff.

C. P. Goree, Asst. U. S. Atty., of Atlanta, Ga., for defendant.

SIBLEY, District Judge. This case was argued at the previous term, and decision reserved. The court being fully advised, it is now considered and adjudged:

Conclusions of Fact.

The main facts are agreed to in a stipulation, which need not be repeated, but some additional conclusions drawn from them may be helpful. The plaintiff will be referred to as the trust company, the Coca-Cola Company of Georgia as the old company, and the Coca-Cola Company of Delaware as the new company.

I find that the agreement of August 21, 1919, between the trust company, and its New York associates, touching the purchase of the stock of the old company, the organization of the new company, and the disposition of the stock of the latter, was a real and binding contract among financially responsible persons, herein called the bankers' syndicate. Such also was the contract made the same day by the trust company for the bankers' syndicate with the owners of the stock of the old company by closing the options held thereon.

The contracts made a few days afterwards by the bankers' syndicate with another group, called the selling syndicate, for the subscription by the latter for 417,000 shares of the common stock of the new company at $35 per share, were bona fide and binding contracts of responsible persons, and the same is found to be true of the resales made by the selling syndicate of the subscribed stock to members of the public on August 26, 1919, at a price of $40 per share. The formation of the new company thereafter and the issue of its common stock, to wit, 83,000 shares to the bankers' syndicate at $5, and 417,000 shares at $35 through the selling syndicate to the public, were only formal acts carrying out the previous commitments, and have no additional significance.

So, also, the transfer of the old company's assets to the new company for 10,000 shares of the preferred stock of the new company at $100 per share, and of $15,000,-000 in cash, and the turning over of this consideration by the old company to the trust company as its sole stockholder, and the payment of the whole by the trust company to the former stockholders of the old company under the options, were only the formal acts fulfilling the previous commitments thereabout, and were without additional significance. The arrangements made about August 22, 1919, by the trust company with some of its stockholders to take over some of the portion of the trust company in the 83,000 shares subscribed by the bankers' syndicate were bona fide and binding, and thereby the trust company disposed of 11,223 shares of its said stock at $5 per share to these stockholders, who furnished their own funds to pay the subscription price of the same.

The trust company has never since had any interest in this stock, and has derived no profit therefrom. It retained as its subscribed stock only 13,677 shares. As a result of all these transactions the trust company had left these 13,677 shares, for which it, like its stockholders and the other members of the bankers' syndicate, had paid $5 per share, making a total investment of $68,-385. This stock could have been sold on the market on August 26, 1919, at $40 per share, but under the syndicate agreement it was tied up in a voting trust for five years. None of it was in fact sold during 1919. The market price thereof afterwards fell as low as $18 per share, but never as low as $5.

Conclusions of Law.

[1] The Constitution permits unapportioned taxation of incomes derived from any source. Yet the thing made taxable is not mere increment of value, but either some new property acquired, or an increment so detached and severed from a former investment as to accrue to the separate benefit and enjoyment of the taxpayer. To be income, it

must "come in"; to be *derived*, it must be separated, taken "from the stream," as the two compounded Latin words signify. The compensation of labor or service is such new property acquired. Interest, rent, profits on sales, dividends on corporate stocks, are instances of severed increment on former investments. All the things mentioned are sought to be taxed in section 213 of the Revenue Act of 1918 (Comp. St. § 6336⅛ff).

[2, 3] The question here is: Was there any form of taxable gain realized by the trust company in 1919 in its acquirement of these 13,677 shares of common stock of the new company at $5 per share? Any gain in the transaction cannot be considered as in whole or in part "compensation for personal services." What is meant by these words is plainly service to another, for which the taxpayer is paid by that other. No one here hired the trust company to do anything. It was the prime mover in all that was done. Its president, Mr. Woodruff, was compensated by the bankers' syndicate for his services by making over to him certain shares of stock; but the trust company paid for all it got just what the others, including its own stockholders, paid for what they severally got. Trading, investment, rather than services, were the source of the gain.

The stock did not come as a dividend from the old company. The old company never had anything to do with the new common stock. No profit of any sort came directly from any transaction with or about the old company. Its stock, carrying its assets, was acquired for 10,000 shares of preferred new stock and $15,000,000 cash. The assets were sold to the new company for exactly that, without gain or rake-off. The gain made by the trust company as a member of the selling syndicate, by subscribing for 417,000 shares of common stock at $35 and selling it at $40, has already been taxed, and is not involved here.

The 13,677 shares in which it is supposed the trust company made a taxable gain, were bindingly contracted for on August 21, 1919, at $5, with an agreement to pool it for voting purposes for five years. While it was *believed* on that day that the other stock could be disposed of at a price that would provide the balance of the cash necessary to buy the old company, and that thereby all the stock would be made worth more than $5, or even $35, per share, nevertheless on that day the stock had no market value, and its future was wholly uncertain. While the stock was not actually issued to any one till September 13, about three weeks

later, the investment was really made by the binding agreement of August 21, and the transaction must be tested as of this date. The trust company on August 21 bound itself to take this stock, together with that passed on to its stockholders, at $5, making its promise good when the stock was ready to be issued, and this is the main fact stripped of all complications. It apparently made a good investment, and a few days later "had a profit in it," as the phrase is.

But it seems to me that the profit *remains* in it till realized by a sale or other conversion. That the market value of unpooled stock on August 26 was $40 is of no more consequence than the market value on December 31,° or any other date. Property bought by a taxpayer is not valued to ascertain gain at the end of each month or year, but increment or loss in value stands unascertained till there is a sale or exchange. No taxable gain was *realized* in this stock by its mere purchase. It appears that portions of it have been sold since 1919, and tax paid on the ascertained profit as of the year of sale. This, I think, is the correct way to tax these operations. It follows that the tax assessed and collected on account of this stock for 1919 was improperly exacted, and should be repaid.

A judgment may be presented for signature in accordance with these findings.